podium and identify yourselves with telling us who you are and who you represent and quick call the case. Case number 10-3502, Jennifer Hornacek v. 5th Avenue Property Management. Both sides. Both. Good morning, your honors. Grant Dixon on behalf of the plaintiff appellate Jennifer Hornacek. Defendants. Good morning, your honors. Yolanda Keller on behalf of defendants Brannan Family Limited Partnership, John Brannan, Lawrence Brannan, Linda Marks, 5th Avenue Property Management. Good morning, your honors. Bill McElligott on behalf of Eric Rice Individually and doing business as ET Snow Removal and Lawn. Very good. Each side is 15 minutes. We'll give you 20 since there's two defendants. But it does behoove you to get your strongest point first. It's a slip and fall, but it's a very interesting case. But I can assure you we've read the briefs and the pertinent portions of the record. We're familiar with the facts. So get your strongest points. Anytime you're ready, Mr. Dixon. Thank you, your honor. May it please the court if I could reserve three minutes for rebuttal. Sure. Thank you. Grant Dixon on behalf of the plaintiff appellant. This case comes before the court on the granting of two separate motions for summary judgment. One on behalf of the Fifth Avenue defendants, which are the property owners, and I'll refer to them as such, and the Rice defendants, the snow removal contractors, and I will refer to them as the Rice defendants for convenience purposes. Your honor, the record reveals that snow was plowed into an unusual corner of an unusually shaped building, shaped in the form of an L. That snow melted when the Chicago temperatures moderated, and then when the temperatures got below freezing again, that snow and water that had formed, melted, formed ice in a parking lot. My client on January 25th, 2007, Mrs. Jennifer Hornacek, was walking in that parking lot after leaving work when she slipped and fell. She sustained injuries. We filed suit on her behalf in order to pursue a negligence cause of action against several defendants. Two groups of those defendants remain in the case on this appeal, the owner and the snow removal contractor. All of this melting occurred after the snow had been moved. Precisely, Justice. By the Rice. Exactly. So we're dealing here with an unnatural accumulation. Correct. And the unnatural accumulation, as this Court wrote in the Williams case just this year, that duty of that snow removal contractor is to do the duty of reasonable care for that snow removal contractor. And in fact, Mr. Rice himself testified in his deposition, and that's contained in the record, that he was not to plow snow into that corner. He was aware of that. And the other witnesses, of course, Mr. Rice denied that he did that. But a number of other witnesses have testified that, in fact, they saw the snow plowed into that corner, and because that snow was in that corner, they also saw it melting and causing the ice to form. How would you define Rice's duty? Straight negligence? I would define it as straight negligence of the reasonable care of a snow removal contractor in a like situation. All right. What did you have in your affidavits to show a question of fact that would have precluded summary judgment? With regard to the duty itself, obviously, because we have the testimony of several witnesses saying that there was snow piled into that corner, we believe that that's sufficient to sustain our burden for summary judgment purposes. With regard to the breach, that snow removal caused an unnatural accumulation in the corner, and that was testified to with regard to three witnesses, Bonnie Hampton, who is the franchisee of the business that Mrs. Hornacek worked in, David Hampton, and Wayne Lawler. Those three witnesses each separately testified, and I can provide the page sites if the court would like, as to the snow that had been piled in that corner. With regard to David Hampton, David Hampton specifically testified regarding January 25th, the day of this fall, that there was snow that had been plowed into that corner, and it had formed ice, page 2456 of the record. And so we know that the snow had been piled into that corner, had melted and formed ice, and it was something that Jennifer Hornacek encountered that day. Where is she supposed to put the snow, Mr. Rice? Generally, they're driving these big trucks with snow plows in front of them. They have to shove the snow somewhere, right? They don't have flamethrowers. They use plows. So where should you put the snow? Well, there's certainly, there was some discussion in Mr. Rice's deposition on my questioning about that very topic. One of the places he could have plowed the snow is to the west end of the property, away from the building. The property is divided from a gas station that has an aluminum railing there. There is also, on the other side of the property, on the north side, there's a grassy area that divides that property's parking lot, the 1402 property, from a public roadway. The snow could be piled there, and in fact, there's a drain in that area. There were certainly options for Mr. Rice to place the snow there. And importantly, he testified, he knew he wasn't supposed to put the snow where we have the witnesses that say that it was there. And so the next question that the Court has to consider is, even if there's a natural accumulation, an unnatural accumulation, does that mean that that's what caused Jennifer Hornacek to fall? And indeed, the evidence shows here that there's at least a question of fact there, and I suggest the evidence will prove at trial that it did, there was an unnatural accumulation that caused her to fall. Ms. Dickson, let's talk about the question of fact. I think we all agree that if there's a question of fact, summary judgment is not appropriate, right? Correct. So highlight for me your top three fact questions that you think, in this case, precludes the entry of summary judgment by the trial court. I think that the top three are, number one, the evidence that the snow had been plowed into the corner and created an unnatural accumulation. That's number one. There were multiple witnesses who testified to that. Number two, that that snow removal, that forming of the snow in the corner by Mr. Rice in an unnatural way, caused ice to form. And again, that was testified by Bonnie Hampton and David Hampton. And then that ice was there that particular day. And David Hampton's testimony is particularly important in this regard because David Hampton comes to Mrs. Hornacek's rescue. She's the first witness that we know came to her rescue. There's an unknown witness. We don't know who that is. But David Hampton is the first deposed witness. And he says on that day, at the time that he gets there, Jennifer Hornacek is in this big ice flow as he describes it. And if you read the context of the questioning, it's about the ice flow that's flowing from that corner. So the plowing, the unnatural accumulation, and the ice flow that is indeed there that day are the three most important fact questions that I think are for this Court. Was there any testimony regarding where the ice flow emanated from? Where did it come from? Multiple. And I should point out to the Court that originally we had this parking lot had been repaved in 2006. And we had a theory, a cause of action against the paving contractor because all of this ice flow was testified to by Wayne Lawler in particular. This ice flow started after the paving had been redone. And they are out on summary judgment. Their issue is not for us to consider here. But I'm sorry. But there was also testimony that the ice flow didn't start after the paving. Would that be a fact question, too? It certainly could be, Judge. And I think what you're highlighting, Your Honor, is the exact reason why we have juries in this country. We need a jury to sift through this evidence. I'm certain that opposing counsel will point out the places in the depositions where witnesses vacillated or gave different answers. But that's precisely why a fact question exists here. Because I think the evidence shows that there's at least something that a jury should be considering on those issues that the Court is highlighting. Namely, was this ice actually coming from that snow pile? I'm sure there will be opposing evidence. But all that does is proves why we need to have a jury consider this case and not do a summary disposition in this particular matter. I think of particular importance here is what Mr. Lawler says, Wayne Lawler. Wayne Lawler testified, as the Court just highlighted, about the fact that there had been ice in the parking lot before 2006, but that the ice flow consistently existed after the repaving and the snow pile contractor, after the repaving, started plowing into this particular inside corner. His testimony specifically highlights how this all happened. Page 2564 of the record, at the end of his answer, he says, And during the day when the sun was out, I believe the snow was, dash, would melt a little bit and drip out of the pavement. And at night it would freeze up. That's my belief. His opinion, based on a lay observation of what was going on, is precisely what we suggest should have been decided by a jury in this case. That's our theory. That's what we believed happened. And I think the evidence is sufficient for us to allow us to get to a jury on that. But going back, again, this idea of it being an unnatural accumulation, let's say they did what you would if you were the snow plow driver, apparently. You would drive it over to the grassy area and put it up against this metallic thing that protects the driveway. It would still melt and it would still get in the driveway, if not the company's driveway, this building's driveway, it would get in the gas station's driveway. And as you say just now, well, it will always refreeze, because that's what happens in Chicago. We have freeze, thaw, refreeze. Wouldn't, if we agree with you, hold then that all snow plow companies are reliable any time they move snow and put it into an unnatural accumulation, which is a mound? I agree and disagree with the Court. I agree that all snow plow companies, by moving snow, are creating an unnatural accumulation. By definition, that's their job. However, what they are bound to do, according to their duty, and indeed Mr. Rice's testimony, is to plow it into a place that it won't become a hazard. If they plowed it into the street and somebody drives into it, I think we would all agree that that's inappropriate. In this particular case, on the north side of the building, north of the north parking lot, there is this grassy area, and in that very area, if the Court examines the photograph carefully, you'll see that there's a drain there, on the very north end. That's because the entire parking lot is pitched that way, and some of the witnesses testified about this. So because of that, the water would run away from the areas that the people are. In other words, it wouldn't ever get to the locations where pedestrians would be walking. Albeit occasionally, it is difficult for a snow removal contractor to figure out where they are supposed to plow the snow, but that's why you hire professionals. That's why Eric Rice testified to his many years of snow removal experience. It's not something that you just get into a truck and start driving, and indeed, at the very beginning of his deposition, I established that, that this is an expert who is doing what he's supposed to be doing, and in this case, he did it wrong. And by doing it wrong, he creates an unnatural accumulation, by definition. But that unnatural accumulation then melts and forms ice in a place where he knows or certainly should have known that pedestrians were going to be walking. He's responsible if he does that, just like if he had plowed it out in the middle of the street and somebody had driven into it with a car. Didn't the Hamptons testify that this was a known problem, for about a year already? I would suggest that I agree with the court's interpretation, and I would suggest that opposing counsel would disagree with the court's interpretation. Certainly, what the evidence clearly shows is Bonnie Hampton answered interrogatories in the case where she reported to the landlord that this was consistently a problem, that they consistently had this problem, and Bonnie Hampton testified that it had been there for a long time. I think the exact testimony was a very long time, something along those lines. I don't think that anybody would argue with any credibility that ice was not a problem in this parking lot. It clearly was. But after the parking lot was repaved in 2006, the snow removal contractor changed the way he plowed because the trash cans get moved and certain other things. And the testimony is clear that that plow was plowing into the corner, and because it's plowed into the corner, it's allowing water to create and make ice and causing my client to fall. There's a recent case cited, not by either party, Crywin v. CTA, August of 2010, 238 Illinois 2nd, 215, where the Supreme Court pointed out that there's no time limit, there's no time quoting, there is no exception to the natural accumulation rule based on the passage of time. So if you, again, understand your argument that this is an unnatural accumulation, you can have snow and icy conditions in a parking lot for the whole winter, and it doesn't matter if everybody knows it's icy because the rule is the rule. Well, and I don't necessarily disagree with the Supreme Court's interpretation of that fact. However, we're bound by it regardless of whether I agree or disagree. I understand that. But the distinction in this case is while they may have created an unnatural accumulation here and that can't exist the entire winter, what's not existing the entire winter in this particular case is the ice that's present on January 25, 2007. The court is correct in that there is no evidence precisely that tells us when this ice started, but we know when Mr. Rice last plowed, and we know the testimony is that this was a consistent problem, which all makes sense. If you believe that he's plowing into this corner consistently, ice is going to consistently form in the parking lot. But I'm not troubled by the fact that if somebody does something wrong, creates an unnatural accumulation in an area that it shouldn't be, violating his own testimony of what his duty and responsibility is, I'm not troubled by the fact that his liability continues for the entire winter. If I build a building wrong, I certainly should continue to be responsible, at least to the end of the statute of limitations, if that building later fails. That's part of the concept of negligence. He set in motion a chain of events that allowed somebody to be hurt if they encountered that position. So we should hold that snow plow removal people are guarantors of the conditions once they plow it once a year. No, and that's not the case because in certain circumstances, if it's, for example, a condition that the plaintiff was aware of and encountered it deliberately, it was an open and obvious condition. Neither of which apply here. Then the plaintiff- Just one second. I thought you just said that everybody was aware of the ice problem in the parking lot, that this parking lot had ice all the time and people who worked there were aware of it. So it was open and obvious, wasn't it? Well, it was not in this particular case. There were three people who testified that ice was a consistent problem. Bonnie Hampton, the franchisor who leased the space. Her son, David Hampton, who was kind of the office manager as well as a realtor. And then Wayne Lawler, who himself had slipped on ice, albeit in a different location before then. And those three were obviously aware of it from personal experience. Jennifer Hornacek was never aware of ice forming in this parking lot and didn't testify as such. But even if she had, she was specifically questioned about, did you see this ice beforehand? And she said no. In fact, she was asked, did you know what caused yourself to fall before you fell? No. She didn't realize it until she's on the ground and her hands are on this invisible ice. And Mr. Hampton, David Hampton, testified that it was difficult to see and he was slipping all over it as he came to Jennifer's rescue. So I think that getting back to the Court's point, there are certain circumstances in which a snow removal contractor is responsible, but I don't think they're a guarantor. I think that the plaintiff bears a duty and a responsibility as well. But making somebody responsible for their conduct is what negligence is all about here. I think a jury should be entitled to consider whether they have, that Mr. Rice has violated his duty and let's not forget the landlord as well, who, at least according to Mrs. Hampton, was told that there was repeatedly ice problems in this parking lot. Well, they're also going to blame the management company, which is two of the witnesses you just mentioned, are apparently liable, are they not? Theoretically, anyway, for trying to keep the immediate area clear in front of the door. Well, what the defendants have done is named the third party, as a third party defendant, essentially Bonnie Hampton, the prudential. Then there was an argument that they had a responsibility to clear the sidewalk. Well, not before the Court. I don't think their contract requires that. In this particular circumstance, I don't think that's the case, but I can certainly envision cases in which, yes, the landlord, a management company, a snow removal contractor, all would be responsible if they knew about a condition for a long enough period of time. They have a responsibility to fix it. And it's not too dissimilar in many ways from a sidewalk where there's a crack and there's a deviation of two or three inches. At some point in time, a city or a municipality or even a private landowner knows about that defect. They have a responsibility to fix it. A plaintiff always has that responsibility to maintain proper lookout and do what they are supposed to do. But at the end of the discussion, their responsibility as a landowner, as a management company, or whomever, that is still based on the negligence terms. Well, going back to what you just argued, the idea of comparing it to a sidewalk problem, the reason we generally don't hold, besides they tend to be owned by municipalities, we don't hold them liable to municipalities because under the duty analysis you have to look at, there's four factors. One is the foreseeability of the injury, which in an icy area is always. And we're in Chicago. Every time you step out of your car, there's reasonable foreseeability you're going to slip. The likelihood of being injured if you slip, pretty good, especially for large people like me. The magnitude of the burden of guarding against the injury. So your suggestion that looking at what we do with sidewalk cases, that's why we don't hold people who own sidewalks or municipalities liable for sidewalks under, there's a de minimis rule because you can never, nobody can make the sidewalks flat and make them safe. And the fourth one, of course, is how much it's going to cost. You know, the consequences of placing the burden on the defendant. So in this case, the consequences, you're arguing, would be, and I'd suggest is what the trial court did, the consequences of placing the burden on a snow truck, snow plow removal, snow plow driver, and on the owner of a parking lot to guarantee that ice won't melt after it's been put into a mound, which is how it is always done, is too great. It's a public policy question. Well, I don't disagree that the law should never state that a snow removal contractor should never plow their snow so it won't form ice. That's impossible. That's the nature of Chicago, Illinois. But that's not the burden we're seeking to impose here. The burden we're seeking to impose is for Mr. Rice to follow his own instructions with regard to duty and responsibility, not plow it into a place where you know it is going to melt, form ice in a parking lot. And in this case, all Mr. Rice had to do is do what he says he did, and that is to plow it to the west or plow it to the north. He didn't do that in this case, and so he should be responsible. The magnitude of the burden is actually minuscule and far smaller than in a sidewalk. It's simply a decision that all he has to do is he has to decide that he's going to turn his car in this case, or his truck in this case, to the right and go to the west, further west in the parking lot, or push the snow backwards and out. Either one of those would have been sufficient, and that's what Mr. Rice. Unless Hornacek had parked her car in the far part of the lot, you know, next to the gas station, had he done what you suggested he do, had it melted there instead, and she slipped and hurt herself very severely, in which case he'd still be in front of us, we imagine, saying, well, you know, it's terrible, he plowed the snow. Well, the reason why I don't think that's the case in this particular set of facts is because if he'd done it where he said he should have done it, there's no way ice could ever get in the parking lot, because it ends up out in the grass next to a drain, right next to a drain, and so there's no way the ice would ever get out in the parking lot. Second, this particular parking lot, as it's configured, there's not parking out there. That's not where people park. It's more of a through area, and so I think the magnitude of the burden is incredibly small, one of the smallest we could ever conceive, because all he has to do is just drive his truck a different place, and that's what he says he's supposed to do, and in this case, the evidence shows that he didn't. That's why I don't think that it's appropriate. Ice forms in Chicago, that's a known fact, but when somebody causes it to form someplace where he knows or should have known that pedestrians are going to be walking, he's responsible for that, and that's why we have these rules and regulations in regard to negligence. We allow a jury to determine whether in this particular set of facts this is the appropriate conclusion, the appropriate ruling. Here, we're just seeking to have a jury get to that point, to allow a jury to determine whether Mr. Rice is responsible for Jennifer Hornacek's admittedly severe injuries, and whether the landlord, as the owner of the property who, at least according to testimony, knew about the ice formation in the parking lot and did nothing about it, should also be responsible for this parking lot ice formation, and eventually at least allow the jury to determine if Mrs. Hornacek's injuries, if they're responsible for those. Do you have anything else? You still have time for reply. No. I am finished. I was just going to wrap up, if that pleases the Court. We respectfully request that the Court reverse the lower court's summary judgments and allow us to have a jury determine the responsibility of these parties. Thank you, Your Honors. Thank you. Anytime you're ready. I can't believe it. Who's first? Good morning. Yolanda Keller on behalf of the Brannon Defendants. The record in this case shows that the Brannon Family Limited Partnership purchased this property in 2003. In 2005, the rear parking lot where Plaintiff fell was graded and repaved by co-defendant Imperial Paving. Imperial Paving was granted summary judgment also in the lower court, and that granting of summary judgment has not been appealed from by the plaintiff. The record also shows that my clients contracted with Eric Rice for snow removal and for salting of the lot. In fact, all of the record shows that my clients were not negligent in the maintenance of this property. They had the whole parking lot repaved two years after they purchased it. They had a contract for snow removal for salting. Counsel, let me ask you before I ask your opponent. Certainly. This case is before us because of the entry of summary judgment, correct? That's correct. And we all agree that if there are any material issues of fact, summary judgment is not appropriate. Is that right? That's correct. You heard me ask your opponent his top three reasons. His top three questions he felt would preclude summary judgment. What do you think about that? What do you think about the three that he listed? Did you hear them or would you like me to repeat them? I did hear them. Okay. Tell me why those are or are not questions of fact. Okay. Based on my notice, he writes that evidence was plowed into the corner, that there's evidence that the snow was plowed into the corner and that ice was forming and that, and I can't actually read my writing for the third point here, but that ice was present on the day of the incident. I think looking at the deposition testimony. The third one is that there was a river of ice. River of ice. That flowed into that area where the plaintiff fell. Okay. First of all, we have to look at the deposition testimony of the plaintiff. She made admissions during her deposition testimony. She specifically testified that she wasn't talking about a river of ice. She basically testified that she fell on invisible ice. She said there was nothing was shiny. You couldn't see anything. She slipped. She specifically testified this was free of slush or snow. She said it was clear. She didn't know how long the invisible ice was located in the position where she fell, and she didn't know the source of the ice. She worked for American Homes, a tenant at the property. She was familiar with the parking lot. Wait a minute. Didn't she say she was 99% sure that the ice came from, I read that someplace, that the ice that she fell on was as a result of something that was melting? I don't believe that's the case. I think that would be the deposition testimony of Mr. Hampton. Okay, but somebody testified to that. Would that create a question of fact? I don't think that creates a question of fact. You had three employees of American Homes who testified in this case. You had Bonnie Hampton. Mrs. Hampton specifically testified that she doesn't recall if there was any snow plowed into that corner on the day of this incident. She has no idea where the ice came from, on which point it fell, and Mrs. Hampton was there immediately after the incident along with her son. She is the mother of David Hampton. She testified. She never testified about an ice flow. She said at times there might have been a rivulet, but she specifically said that where the plaintiff was located was beyond that portion of the rivulet. And she was specifically asked during her deposition if it's her understanding that snow melted from a snow pile and caused ice to form, and she answered no. Well, that was one person. That was one person. But let's see, I'm just reading from page 16 of your opponent's brief. Okay. They say testimony shows that the snow from the parking lot was plowed into the corner by the snow plow contractor, Defendant Rice. This snow would melt and the water would run into the parking lot. The water would freeze, forming ice. This same ice is what caused Mrs. Harnacek to fall. Are you saying that there was no such testimony in this case? There was no specific testimony that there were snow piles in their corner from either from anyone other than some speculation on the part of Mr. Hampton. Mr. Hampton is the only one who talked about snow piles, and he specifically testified, and this is at the record. I'm trying to be specific here, Ms. Keillor. How do you pronounce it? Keillor. Keillor. I don't know whether Mr. Hampton was speculating or not. My question to you is, did he testify that snow was plowed into that corner of the building? Whether it was speculative or not is not for me to decide. I'm just asking whether there was any such testimony. He did testify that at times he thought there was snow plowed into that corner. But my next question is, doesn't that present a question of fact? No, it does not. He testified that it being the winter, you know, I would say it's reasonable to say that there were snow piles there. To me, that's a big difference from saying I physically saw snow piles there and this is what she fell on, a cause of her fall. At one point, she did testify she's near the ice flow. At another point in his deposition testimony, he says he saw her east of that area. So I would say that the deposition testimony of Mr. Hampton is internally inconsistent, contradicts the plaintiff and everyone else in this case, is speculative and is not sufficient to form a question of fact in this case. So with respect to my clients, we have two issues here. I have another question. Okay. Because this is summary judgment, the threshold that the plaintiff needs to meet, they just need to show some facts. Some facts that are sufficient to form an issue for the jury. Some facts. That's the standard and it's been the standard in this state for a long time. Do you think that there are no facts in this case? Did they show some facts to support their case or are you saying they showed nothing that could possibly support their theory? I'm saying they did not show facts to establish a material issue of fact in this case. With respect to my client, we have two issues. Whether she fell in on a reasonable accumulation of ice and snow and secondly, whether there was any type of notice to my client. The testimony the plaintiff's counsel referenced was that of Bonnie Hampton and in her deposition testimony, she specifically stated that she is not aware of anyone making any complaints to the management with respect to this area where the plaintiff fell. Her complaints were with respect to the area next to the door and she talked at length how the landlord then replaced the door and the lot was repaved. So there is no testimony in the record that anyone specifically complained about this so-called ice flow or this part of the parking lot to my client. My client, Mr. Brannon, specifically testified he was aware since purchasing the property of only one other fall on ice that included in a different parking lot at the front of the building. He came to the scene immediately at that time. It was just after a snowfall. It was in the winter prior to this incident. But he was not notified of any other falls and he was not notified of any complaints regarding this area of the lot where the plaintiff fell. Ms. Taylor, back to the question I asked you earlier. On page 15 of your colleague's brief, he says, plaintiff's assertion that she was 99 out of 100 percent sure that the ice was formed by the melting of unnaturally accumulated snow was based upon complete speculation and was not enough to raise a genuine issue of fact as to whether the ice was created by unnatural accumulations of snow. Can you just comment? Can you comment on that? I believe what her testimony actually was is that she fell on invisible ice. I don't recall reading any such thing in the record other than that she fell on invisible ice. Anything else? Nothing else. Thank you. Thank you. Mr. McElligott. May it please the Court, Counsel, I think I'd like to just jump into some of those questions that you asked earlier. And I think it's important to differentiate the testimony that Plaintiff's Counsel has referred to, that being Mr. Lawler, Bonnie Hampton, and David Hampton. Mr. Lawler was also one of the gentlemen who came out to the scene immediately after the occurrence to assist. Mr. Lawler was asked questions about the conditions that existed out there. And he was asked, in regards to this particular fall involving Ms. Hornacek, did she ever tell you she fell on ice? She told me she fell. I don't know. I don't remember. We don't know what, if any type of. She could have tripped on her shoelace. I don't know. You don't know what she fell on. True, sir? That's right. Do you know how long before Ms. Hornacek fell, the lot was plowed? Do I know how long was it plowed? No. So is it your testimony you don't recall specifically there being any ice directly in the 10 to 15 feet outside the back door after her accident? I don't recall any ice. You don't recall any ice in the parking lot in general that day, am I correct? I don't recall any ice in that area that I walked because I wouldn't go in the back after. You didn't recall any ice. That's Mr. Lawler. Didn't testify anything about snow having been plowed into that corner that we've been talking about, the southwest corner, which forms the L that we've discussed. Mrs. Hampton, who's the second person out there assisting after her son came out, testified that she does not know where the ice came from that plaintiff fell on. Ms. Hampton does not know what caused plaintiff to fall. Then Ms. Hampton was asked a very direct question, and the question is at page 22730 of the record. Is it your understanding that on the day of the accident, snow melted from a snow pile and caused ice to form? Her answer was no. Then we move on to David Hampton's testimony. And before I get to his for a moment, the only testimony as to the conditions in that corner that came about in the record is my client, Eric Rice, who wasn't sure if he was called there the day of the accident or the day after, after he received a call from the management company. Mr. Rice said there was a little bit of ice and a little bit of snow in that corner. It had not been plowed to that corner. It was just what was left over when you couldn't get the blade up to the building. He testified even in that area that he got about a foot up to the building, but that's as far as he could without damaging the building itself. That's the only testimony about this mound, pile, whatever you want to call it, as to its dimensions, a little bit of snow and a little bit of ice. There's no testimony about the dimensions of that, quote-unquote, mound or pile, whatever you refer to it as, outside of Eric Rice. We get to Mr. Hampton. Mr. Hampton was asked these questions. And the ice would occur when snow that had been removed in the lot would thaw and then refreeze, is that correct? To the best of my guess. I mean, I guess I really never figured out what it was. You really didn't know what the source of the ice was. True? Answer? Well, true. I mean, I don't, you know, I'm not like, you know, I don't really, I can't say to know for sure. That's his specific testimony. And you can tell by the way that I read it that it is specific as to Mr. Hampton. What I'd like this Court to focus in on is a very important factor that hasn't been addressed yet, which is the conditions or the temperature. The record is devoid of any evidence that the temperature ever, in order for it to melt and refreeze, would have to go up to a certain level, at least 32 degrees or higher, and then the weather temperature would fall, and then after it melted it would refreeze. There's absolutely no evidence or testimony that in this January time period, the weather ever got to a point above freezing that could have caused a freeze-thaw cycle. And I could cite to you case after case, the Russell case. But there is testimony that there was ice in that parking lot. I think we can all agree that there was ice in the parking lot, right? I agree. In fact, Ms. Hampton, or excuse me. Well, the planter fell on ice, and I don't think anybody disputed that there was ice. She said she didn't see it before she fell. But did anybody say, no, it wasn't ice you fell on, it was something else? I mean, I think we can agree there was ice in the parking lot, so I'm not sure if I understand the inference you're asking us to draw from the fact there was no evidence regarding the temperature changes for that day or before that day. What I would state to you is that there was no evidence that snow plowed into a mound by my client, and there is no evidence of that on that day. It might have been on prior occasions somebody's testified to that, that that melted, apparently streamed off a distance of 10 or 15 feet, and then when the temperature rose it refroze. There's absolutely no evidence, no even speculation to that effect in the record. Ms. Hampton testified there was snow and ice in the lot when she got out of her car and that she was avoiding it on the way in, snow and ice cover. So, yes, there was snow and ice in that lot, naturally accumulating snow and ice, no evidence of unnatural accumulation of ice. In each of these cases, in fact, the Russell case, which is cited in great detail by the plaintiff's attorney, there's evidence that it seemed clear to him that the ice got there as a result of the snow melting in liquid form and then being frozen as the temperature lowered. The plaintiff testified that the days were warm and the nights were below freezing. The Wells case that was also cited here in the briefs, the appellate court found that there was no periods of alternate thawing and freezing for a week preceding the accident. As a result, this is the First District, the plaintiff failed to show that the ice in question was an unnatural accumulation. I would state, too, that those are the facts of our case. If we go on to the McCarthy case, they had an expert, a licensed architect, who testified the temperature fluctuated above and below the freezing point until it remained below the freezing point on the day of her fall. Plaintiff's expert architect concluded that this weather pattern would have avoided embankments to alternately cause embankments, excuse me, to alternately melt and refreeze, thereby forming an unnatural accumulation of ice in the area where plaintiff fell. And the Webb case, the same thing, the counsel for the plaintiff in terms of weather report. Is this matter of temperature really a defense? Is it really a defense? You're raising a defense that the plaintiff initially here on a summary judgment hearing doesn't have to anticipate. They need only show factual basis for the negligence of the parties. And if you've got a defense here on temperature, that's another issue. That's outside of our consideration. It's not part of the prima facie case. The plaintiff has to show. He has to show that the ice was unnaturally formed. And he hasn't ‑‑ there's no testimony to that effect that on a date in question when Ms. Hornacek fell, that she fell on a patch of ice which unnaturally formed, presumably by his theory, as a result of ice or snow being plowed in some area where it shouldn't have been, melting and then refreezing in order to show it was unnatural. But, Mr. Madoga, that's not what they say. They say just the opposite, that there was testimony that the snow plow operator routinely plowed and piled up snow in that corner of the building and then the snow would melt and it would run, the river of water would run into the parking lot and then it would freeze and become ice. That's what they say. And my question is, isn't that a question of fact? And if so, why is summary judgment appropriate? It didn't create a question. What they testified to is what happened on prior occasions is not what their testimony was on this occasion. When they came out to view the scene directly after the fall, they had every opportunity to say, geez, we saw that same condition existing there. Not a single witness testified that there was a bank, a two‑foot, three‑foot, four‑foot high bank of snow. None of them testified to that effect. None of them testified that there was a steady stream coming from some snow plowed mound into the area where plaintiff fell. Let me ask you another question. Can the trier of fact draw reasonable inferences from the evidence that's presented, such as in this parking lot, after, there's a, I guess, some evidence that after the repaving of the parking lot, the slope of the lot changed somewhat. And then after that, it seems like there was some testimony that accumulations of snow and ice was a continuing problem. So can reasonable inferences that can be drawn from that testimony, is that something that a judge should consider when determining whether summary judgment is appropriate or not? I don't believe in this case, based on the facts presented to this panel, that there is enough evidence or a question of fact created, especially when you look at the other appellate court decisions. The one I think Your Honor may have alluded to was the 99 and 9 tenths, which is the crane case where the woman testified that there was some snow embankments on the perimeter of the lot, and she was 99 and 9 tenths sure that there was a freeze-thaw pattern and it froze into one of the ruts in the parking lot. And appellate court said that that wasn't enough. And in this case, what the testimony we have here falls far short of what the facts that have been decided in many of these other what I'll call analogous cases. I think the most analogous case is the crane case. So I believe that, in fact, that was the crane case that I was just citing too. I don't believe the question of fact has been created based on the testimony of those people that were present directly at the occurrence, including the plaintiff who testified, I do not know what the source of the ice was, I do not know how long that ice was present, I do not know how that patch of ice was caused to form, especially in light of the fact that she's testifying to other ice and snow in the parking lot in a different area, outside and completely away from the back door, does that make inference that it was naturally occurring snow and ice in that lot? It had nothing to do with my client's plowing. Do you have anything else, Mr. McGill? No, I'm finished. Thank you for the interview. Thank you. Mr. Dixon, briefly, in reply. With the luxury of time, I did find the 98% sure citation, that was D.J. Hampton that the court was inquiring about, in which he was asked on page 2456 of the record whether ice had actually caused Jennifer to fall. And because it's been such an issue, I thought it important to read that portion of the testimony. He described that there is a big ice flow that kind of went from the ice pile describing the pile in the corner that bisected the parking lot, and so that, you know, that is what I'm 98% and then dash. Well, in fact, I know that's what Jennifer slipped on. So that was the big obstacle. And Jennifer testified that the only thing that caused her to fall was invisible ice. D.J. Hampton is the only other witness who testified about coming to her aid that particular day. Mr. McElligott speaks of the fact that there's no evidence about the quantity of snow in this particular parking lot and piled into this corner. And, in fact, Mr. Lawler testified, again, page 2601 of the record, that he saw six to seven feet of snow piled in that corner. And, in fact, Mr. Hampton talked about how it was consistently there. Mrs. Hampton said specifically that she observed the snowplow contractor plowing into that corner. She saw it, firsthand knowledge. That snow did cause ice because Mr. Hampton, 2479 of the record, said that he saw ice moving from this spot, referring to that corner, and a water line moving down into the grass. And Justice Quinn had asked about the location of the plowing. That's where the water is all moving towards is the grass where we suggest the jury should determine whether that plowing was appropriate. Mr. Lawler referred to the fact that ice would form after the temperatures had moderated. The disputed testimony this Court has highlighted is precisely why summary judgment is inappropriate in this particular case. The duty is well established. The burden of the fixing this particular problem is incredibly small. And we ask that this Court reverse the appellate court rulings on both facts and remand the case for further ---- The trial court. The trial court. I'm sorry. I misspoke. And remand this case for further proceedings. Thank you, Your Honors. It's been a pleasure. I thank you all sides for the excellent briefs, the fine arguments. We really appreciate it. Thank you. This case is taken under advisement and this Court will be adjourned.